1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    UNITED STATES OF AMERICA,              No.  2:25-cr-00140-DAD

12                 Plaintiff,                ORDER GRANTING IN PART AND
                                             DENYING IN PART DEFENDANT
13          v.                               NASSAR'S MOTION TO SUPPRESS
                                             EVIDENCE
14    AHMAD NASSAR,
                                             (Doc. No. 30)
15                 Defendant.

16

17          This matter is before the court on defendant Ahmad Nassar's motion to suppress evidence

18   obtained as a result of a stop of the vehicle he was driving carried out by Elk Grove Police Officer

19   Colby Hanna ("Officer Hanna") on November 17, 2023.  (Doc. No. 30.)  Hearings on defendant's

20   motion to suppress were held on September 15, 2025, October 7, 2025, and October 17, 2025,

21   and an evidentiary hearing was conducted on October 22, 2025.  At each of the hearings Assistant

22   United States Attorney Elliot Wong appeared on behalf of the government, and attorney David

23   Fischer appeared on behalf of defendant Nassar.  Following the evidentiary hearing held on

24   October 22, 2025, the motion was taken under submission for decision.

25          For the reasons explained below, the court will grant defendant Nassar's motion to

26   suppress evidence in part and deny it in part.

27   /////

28   /////

                                                 1

1          BACKGROUND[1]

2    **A.      The Initial Stop**

3          On November 17, 2023, Officer Hanna was on uniformed patrol in Elk Grove, California.

4    At approximately 4:00 a.m. when he observed a black Toyota 4-Runner exit the parking lot of a

5    casino, drive north, then turn into the parking lot of the Elk Grove Kaiser Permanente Promenade

6    medical offices (the "Kaiser Office").  Officer Hanna then observed the vehicle drive to the rear

7    parking lot of the Kaiser Office, which was obscured from his view from the main road.  Officer

8    Hanna concluded that the Kaiser Office was closed because the interior lights in the building were

9    dimmed and no vehicles were parked in the front parking lot that faced the main road.  To

10   determine whether the vehicle had mistakenly pulled into the parking lot, Officer Hanna parked

11   south of the parking lot entrance, turned off the headlights of his patrol vehicle, and waited to see

12   if the Toyota 4-Runner would re-emerge from the parking lot.  At approximately 4:03 a.m., the 4-

13   Runner had yet to exit, so Officer Hanna reactivated his headlights and drove into the parking lot

14   to investigate further.  As Officer Hanna pulled into the rear parking lot he observed the 4-

15   Runner, with its headlights on, driving toward him and the exit "as [Officer Hanna's patrol

16   vehicle] came into view."  Officer Hanna activated his overhead red and blue lights to initiate an

17   investigatory stop of the 4-Runner, and the driver immediately yielded by pulling over to the

18   curb.

19         Upon exiting his patrol car and approaching the 4-Runner, Officer Hanna made contact

20   with the driver, defendant Nassar, called for backup, and placed defendant under arrest after he

21   failed to comply with the officer's commands to remove his seatbelt, put his cell phone down, and

22   then keep his hands on the steering wheel.  After defendant Nassar was arrested, officers searched

23   his vehicle and seized, among other items, mail addressed to both defendant and other

24   individuals, credit and debit cards in names other than defendant's, fictitious checks, card

25   scanning devices, a laptop, access cards, and several cell phones.

26

27   [1] The statement of facts set forth in this order is derived from the arresting officer's police report
     (Doc. No. 31-1) and his evidentiary hearing testimony and the exhibits entered into evidence at
28   the October 22, 2025 hearing.

**B.    The Subsequent Investigation and Pending Case**

At the time of his November 17, 2023 arrest, defendant Nassar was serving a term of federal supervised release as a result of his 2019 convictions for unlawful possession of fifteen or more access devices, aggravated identity theft and being a convicted felon in possession of a firearm in *United States v. Nassar*, Case No. 2:17-cr-00104-DAD-1.  Upon arrest he was transported to the Sacramento County Jail where officers informed defendant's Supervising United States Probation Office of the arrest and reported that defendant Nassar would be released from local custody within hours.  (Case No. 2:17-cr-00104-DAD-1, Doc, No. 94 at 3.)  The United States Probation Office requested EGPD "to instruct [defendant Nassar] to report to the United States Probation Office following his release from the jail."  (*Id.*)  Defendant "failed to report to the probation office" and also "failed to make any contact regarding" the EGPD arrest."  (*Id.*)  On December 8, 2023, defendant Nassar's supervising probation officer filed a petition charging him with having violated the conditions of his federal supervised release by engaging in a new law violation on November 17, 2023 and, importantly for purposes of resolving the pending motion, with having failed to report his November 17, 2023 arrest to her as required.  (*Id.*)  On December 11, 2023, U.S. District Judge Kimberly J. Mueller signed the warrant for defendant Nassar's arrest on the violation petition.  (*Id.*, Doc. No. 95.)  Sometime thereafter, the California Bureau of Gambling Control ("BGC") issued a "be on the lookout" alert ("BOLO") to Northern California casinos instructing them to monitor those patronizing their establishments since defendant frequently visited casinos in the Northern California region.  On January 20, 2024, defendant was detained by security at the Sky River Casino based on the BOLO, EGPD was notified and responded, and defendant Nassar was arrested pursuant to the federal supervised release violation warrant.

/////

/////

/////

/////

/////

3

It was also the case that from May 2023 through December 2023, two brothers, Ahmad Fawakhiri ("Ahmad") and Mohdjamal Fawakhiri ("Mohdjamal"),[2] had their bank accounts accessed without their authorization and suffered numerous unauthorized withdrawals from those accounts. (*Id.* at 3–4.) At the evidentiary hearing on the pending motion, Rakan Fawakhiri ("Rakan"), the son of Ahmad and nephew of Mohdjamal, testified that hundreds of thousands of dollars were stolen from the bank accounts belonging to Ahmad and Mohdjamal during that period of time. Their family first began to suspect that unauthorized activity was occurring in those accounts in July 2023. Rakan reviewed statements for each of the bank accounts in question which revealed that the names of defendant Nassar and Nijma Mashal ("Mashal")[3] were associated with many of those unauthorized transactions. Defendant Nassar and Mashal had no connection to Rakan and his family. The Fawakhiri family began working with bank fraud investigators toward the end of December 2023 to determine who was responsible for the thefts. During that investigation, Rakan was accompanied by a friend to an interview with investigators, and that friend identified defendant Nassar in a still frame from bank surveillance footage in which he appeared to be withdrawing funds from an ATM machine. On December 28, 2023, Rakan and Mohdjamal filed a report regarding the fraudulent activity with the Sacramento Police Department ("SPD"). (Doc. No. 31-2 at 3.) Rakan testified that bank investigators informed him that the investigation was being "escalated" to the FBI due to the amount of money that was stolen from the accounts. On January 3, 2024, Rakan submitted five IC3[4] reports to the FBI detailing the bank account takeovers and identified defendant Nassar by name as the individual responsible for them due to the frequency with which defendant's name appeared on the

---

[2]  To avoid confusion and because they share a last name, the court refers to the alleged victims, and their family member who testified at the evidentiary hearing, by their first names. No disrespect is intended. Also, because one of the alleged victims shares the same first name as defendant, defendant is referred to as either "defendant" or "defendant Nassar" throughout this order.

[3]  Mashal is related to defendant Nassar's wife.

[4]  Testimony revealed that IC3 reports are complaints filed by individuals reporting internet crimes and those IC3 reports are received and reviewed by the FBI.

1  accounts' transaction history.  On January 15, 2024, Rakan and Mohdjamal filed a report

2  regarding the account takeovers with Wells Fargo Bank.  After the FBI became involved, Rakan

3  sent several documents to the FBI including the December 2023 SPD report generated in

4  response to his initial complaint of the bank account takeovers.

5       Now-retired FBI special agent Nassan Walker[5] ("Agent Walker") also testified at the

6  evidentiary hearing regarding the FBI's investigation of defendant Nassar as follows.  Defendant

7  Nassar's potential involvement in the takeover scheme aimed at the bank accounts of Ahmad and

8  Mohdjamal was initially brought to the FBI and BGC's attention during a meeting between BGC

9  Special Agent Christian Norgaard[6] ("Agent Norgaard") and a confidential informant ("CI").  The

10  CI initially approached Agent Norgaard at some point in late 2023.  Later, the CI told agents that

11  defendant Nassar had been arrested on November 17, 2023, the name of co-defendant Ayman

12  Alaaraj ("Alaaraj"), and the involvement of the two in the bank account takeover scheme, as well

13  as other information unrelated to defendant Nassar's EGPD arrest.[7]  On December 12, 2023,

14  Agent Norgaard received a copy of the November 17, 2023 EGPD arrest report.  While he could

15  not recall the exact date, Agent Walker testified that Agent Norgaard was also informed about the

16  SPD report generated in response to the complaint of Rakan and Mohdjamal and initially sought

17  to obtain a copy of it on or around November 27, 2023.  On December 27, 2023, Agent Norgaard

18  /////

19  /////

20  /////

---

21  [5]  Agent Walker was the original FBI case agent in defendant Nassar's previous federal fraud case
22  and in this investigation.  Although retired as an FBI Agent, he continues to work with that
    agency on a contract basis.

23
24  [6]  Agent Norgaard was also serving as an FBI Task Force agent and, along with Agent Walker,
    had been involved in the investigation that resulted in defendant Nassar's prior federal
25  convictions on charges of unlawful possession of access devices, aggravated identity theft, and
    being a convicted felon in possession of a firearm.

26
27  [7]  Agent Walker was unable to recall any detail regarding this meeting with the CI.  In the court's
    view, it appeared that Agent Walker had not prepared to provide testimony addressing the
    relevant issues raised by the pending motion, either because he was not told by government
28  counsel why he was being called as a witness or for some other reason.

emailed a personal contact he had at SPD seeking a copy of the report[8] and ultimately obtained that report in February 2024.

On February 13, 2024, Agent Walker opened an FBI investigation into defendant Nassar's potential involvement in bank fraud and identity theft.  (Doc. No. 31-2 at 2.)  In furtherance of that investigation, the FBI applied for and obtained seven search warrants throughout 2024 and 2025 for various locations and seized evidence of defendant Nassar's unlawful fraudulent activity pursuant to those warrants.

On June 5, 2025, a grand jury in the U.S. District Court for the Eastern District of California returned an indictment in this action charging defendant Nassar in 17 counts with:  (1) Bank Fraud in violation of 18 U.S.C. § 1344(2) (Counts 1–12); (2) Access Device Fraud in violation of 18 U.S.C. § 1029(a)(2), (c)(1)(B) (Count 13); and (3) Aggravated Identity Theft in violation of 18 U.S.C. § 1028A (Counts 14–16).  (Doc. No. 1 at 11.)  All of these counts relate to the bank takeover scheme aimed at the bank accounts of Ahmad and Mohdjamal.

On August 18, 2025, defendant filed the pending motion to suppress evidence.  (Doc. No. 30.)  On September 2, 2025, the government filed an opposition to defendant's motion.  (Doc. No. 32.)  Defendant filed a reply thereto on September 10, 2025.  (Doc. No. 33.)  After opposing defendant's request for an evidentiary hearing, the government subsequently filed a supplemental brief and requested an evidentiary hearing on September 22, 2025.  (Doc. No. 37.)  Defendant filed a reply to the government's supplemental brief on October 1, 2025.  (Doc. No. 38.)  As noted above, an evidentiary hearing was conducted on October 22, 2025, at the conclusion of which defendant Nasar's motion to suppress evidence was taken under submission for decision.  (Doc. No. 42.)

/////

/////

---

[8]  At the evidentiary hearing, Agent Walker testified that Agent Norgaard sent an email to SPD on December 27, 2023, requesting a copy of the SPD police report reflecting the complaint filed by Rakan and Mohdjamal.  However, and oddly, as noted above Rakan and Mohdjamal did not submit their complaint to SPD until December 28, 2023, the day after Agent Norgaard's email inquiring about that report was sent.

1

**APPLICABLE LEGAL STANDARD**

2       The Fourth Amendment states, "[t]he right of the people to be secure in their persons,

3   houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

4   U.S. Const. amend. IV.  The Fourth Amendment applies to the seizure of a person, even if that

5   seizure does not rise to the level of an arrest.  *Terry v. Ohio*, 392 U.S. 1, 17 (1968).  Traffic stops,

6   "even if only for a brief period and for a limited purpose," are "seizures" within the meaning of

7   the Fourth Amendment and therefore are "subject to the constitutional imperative that [they] not

8   be 'unreasonable' under the circumstances."  *Whren v. United States*, 517 U.S. 806, 809, 810

9   (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Colin*, 314

10   F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against unreasonable

11   searches and seizures applies to investigatory traffic stops.").  "A police-initiated traffic stop is

12   reasonable under the Fourth Amendment if the police stop the vehicle because of a 'reasonable

13   suspicion' that the vehicle's occupants have broken a law."  *United States v. Hartz*, 458 F.3d

14   1011, 1017 (9th Cir. 2006); *see also United States v. Hensley,* 469 U.S. 221, 226 (1985) ("[L]aw

15   enforcement agents may briefly stop a moving automobile to investigate a reasonable suspicion

16   that its occupants are involved in criminal activity."); *Berkemer v. McCarty*, 468 U.S. 420, 439

17   (1984) (a traffic stop is permissible where the officer's observations lead him reasonably to

18   suspect that a particular person has committed, is committing, or is about to commit a crime);

19   *United States v. Drake*, 543 F.3d 1080, 1087–1088 (9th Cir. 2008); *United States v. Lopez-Soto*,

20   205 F.3d 1101, 1105 (9th Cir. 2000).  An officer making a traffic stop "must have a particularized

21   and objective basis for suspecting the particular person stopped of criminal activity," in light of

22   the totality of the circumstances.  *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also*

23   *Navarette v. California*, 572 U.S. 393, 397 (2014); *United States v. Valdes-Vega*, 738 F.3d 1074,

24   1078 (9th Cir. 2013) (*en banc*).

25       The reasonable suspicion standard is intentionally abstract, and courts are to give "due

26   weight" to the factual inferences drawn by law enforcement officers.  *Arvizu*, 534 U.S. at 273–77;

27   *see also United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is

28   dependent upon both the content of information possessed by police and its degree of reliability,'

and '[t]he standard takes into account the totality of the circumstances—the whole picture.'")

(quoting *Navarette*, 572 U.S. at 397); *Hartz*, 458 F.3d at 1017 ("Reasonable suspicion exists if

'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the

persons detained by the police are engaged in criminal activity.") (quoting *Lopez–Soto*, 205 F.3d

at 1105).

Of course, the "government bears the burden of proving that a warrantless . . . seizure falls

within an exception to the warrant requirement." *United States v. Job*, 871 F.3d 852, 860 (9th

Cir. 2017); *see also United States v. Steinman*, __F.4th__, 2025 WL 3180282, at *11 (9th Cir.

Mar. 5, 2025).

**DISCUSSION**

**A.      The Initial Stop**

Defendant Nassar contends that Officer Hanna's investigatory stop was unlawful because

all of the facts upon which he relied in deciding to conduct that stop were "entirely consistent

with lawful activity." (Doc. No. 30 at 4.)  Specifically, defendant Nassar argues that Officer

Hanna observed defendant enter a parking lot that was open to the public by way of a public road,

where defendant remained for only approximately three minutes, and there was no indication

whatsoever that criminal activity was occurring. (*Id.* at 5–6.)  In opposition, the government

contends that Officer Hanna had reasonable suspicion to initiate the vehicle stop because

defendant drove to the rear parking lot of the obviously closed Kaiser Office which was located in

a high crime area at 4 a.m. and defendant immediately drove off when Officer Hanna's patrol car

came into his view. (Doc. Nos. 32 at 9; 37 at 8–9.)

Below, the court examines the grounds that the government relies upon in contending that

the vehicle stop was based on Officer Hanna's reasonable suspicion that the vehicle's occupants

had broken or were about to violate the law.

1.      High Crime Area

In support of the argument that Officer Hanna had reasonable suspicion to initiate the

investigatory stop, the government first contends that the Kaiser Office is located in a high crime

area because it experiences "spillover" crime from a nearby casino and there is a history of

criminal activity occurring there.  (Doc. Nos. 32 at 5; 37 at 8–10.)  In reply, defendant argues that any "spillover" crime from the nearby casino justifying Officer Hanna's investigatory stop "would eviscerate Fourth Amendment protections."  (Doc. No. 33 at 4.)

It has been recognized that in determining whether an area can be characterized as "high crime," courts "must carefully examine the testimony of police officers in cases" and "make a fair and forthright evaluation of the evidence they offer, regardless of the consequences."  *United States v. Montero-Camargo*, 208 F.3d 1122, 1138 (9th Cir. 2000).  When conducting this evaluation, the court must ensure that the area described as high crime is limited to "specific, circumscribed locations where particular crimes occur with unusual regularity."  *Id.*; *see also United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002).  "[A]n individual's presence in an area of criminal activity may support the existence of reasonable suspicion when combined with other facts."  *United States v. Luckett*, No. 16-cr-00200-WHO-1, 2016 WL 4719268, at *3 (N.D. Cal. Sept. 9, 2016) (citation omitted), *aff'd*, 729 F. App'x 614 (9th Cir. 2018).

Here, in his declaration Officer Hanna stated that he is "aware that there is a history of vehicle break-ins and vandalism to company vehicles at the Kaiser medical offices."  (Doc. No. 32-1 at 2.)  At the evidentiary hearing, Officer Hanna testified that over the past two years EGPD has responded to approximately 50 calls for service at the Kaiser Office involving thefts from vehicles in the parking lot, suspicious vehicles, suspicious persons, and catalytic converter thefts.[9] He also testified that prior to defendant Nassar's arrest, Officer Hanna had personally responded to reports of suspicious vehicles, thefts from vehicles, the building alarm being triggered at the Kaiser Office, and had cited an individual for possession of drug paraphernalia in the Kaiser Office parking lot.[10]  Finally, evidence presented established that the Kaiser Office is located near a casino where the city of Elk Grove experiences its highest concentration of crime.

/////

---

[9]  Officer Hanna clarified during his testimony that catalytic converter thefts at the cite have not occurred "recently" and that "[i]t's not a trend anymore."

[10]  Officer Hanna testified that this incident occurred at some unspecified time prior to defendant Nassar's arrest.  On November 17, 2023, Officer Hanna had served as n law enforcement officer for approximately one year.

Officer Hanna's declaration and hearing testimony[11] were sufficient to establish that the Kaiser Office is located in what may be accurately described as a high crime area. *See Luckett*, 2016 WL 4719268, at *3 (finding that an officer's testimony describing an area as being well known for narcotics activity and weapons-related crimes along with testimony that the officer "personally has been involved in over 100 arrests while working in the general" area over approximately one year supported a finding of a high crime area); *United States v. Cole*, 445 F. Supp. 3d 484, 489 (N.D. Cal. 2020) (finding that the investigatory stop occurred in a high crime area where "the government ha[d] introduced specific facts to demonstrate the high volume of gang and gun violence around Bookers Liquor Store, where the officers first observed" the defendant); *United States v. Williams*, 705 F. Supp. 3d 1054, 1064 (N.D. Cal. 2023) (concluding that the government established that the stop occurred in a high crime area where the officer testified that the area "was 'known for shootings, robberies, stabbings, aggravated assaults, firearms violations, and other violent crimes.'").  Accordingly, the court concludes that the Kaiser Office was located in a high crime area, a factor that can be considered in determining whether the vehicle stop was supported by a reasonable suspicion of criminal activity being afoot. However, of course, "a suspect's presence in a high crime area alone cannot establish reasonable suspicion, it is [merely] a relevant factor to be considered."  *United States v. Holliway*, No. 5:23-cr-00003-CDB, 2024 WL 5169836, at *4 (E.D. Cal. Dec. 19, 2024) (citing *Diaz-Juarez*, 299 F.3d at 1142 and *United States v. Kitchen*, 11 Fed. Appx. 844, 846 (9th Cir. 2001)).

/////

/////

/////

/////

/////

---

[11]  The court found Officer Hanna's testimony at the evidentiary hearing to be fully credible and will rely upon that testimony in resolving defendant's motion to suppress.  *United States v. Verduzco-Verduzco*, No. 1:17-cr-00231-DAD-BAM, 2018 WL 4057270, at *11 n.6 (E.D. Cal. Aug. 24, 2018); *see also United States v. Lopez*, 757 F. App'x 586, 590 (9th Cir. 2018).  Citations to this and other unpublished Ninth Circuit opinions in this order is appropriate pursuant to Ninth Circuit Rule 36-3(b).

1        2.    Flight

2        Next, the parties dispute whether defendant engaged in flight when he initially observed

3    Officer Hanna enter the Kaiser Office parking lot.[12]  Defendant persuasively argues that the dash

4    cam footage from Officer Hanna's patrol car admitted into evidence at the hearing reveals that

5    defendant was already driving toward the exit when Officer Hanna entered the parking lot.  (Doc.

6    No. 33 at 4.)  The government contends that defendant "immediately drove off when he saw

7    Officer Hanna's marked patrol car follow him into the parking lot."  (Doc. Nos. 32 at 6; 37 at 9.)

8    The evidence refutes the government's position.

9        The dashcam footage from the night of the arrest and Officer Hanna's testimony at the

10    evidentiary hearing clearly established that defendant Nassar's vehicle was already moving

11    forward when the cars came into view of one another.  Indeed, as Officer Hanna's patrol car came

12    into defendant's view, defendant's vehicle can be observed driving toward the officer over a

13    speed bump in the Kaiser Office parking lot as indicated by the vehicle's front headlights shifting

14    up and down twice as Officer Hanna pulls into the parking lot.  Defendant was observed driving

15    at a normal speed and immediately pulled over when Officer Hanna turned around and activated

16    his overhead lights to initiate the stop.  The court concludes that defendant's driving behavior and

17    response to Officer Hanna's show of authority, as established by the evidence, were completely

18    inconsistent with that which could in any way be described as flight.  *See United States v.*

19    *Washington*, No. 23-12612, 2024 WL 4691081, at *2 (11th Cir. Nov. 6, 2024) (concluding that

20    defendant engaged in unprovoked flight where his vehicle was sitting idly in a parking lot at 2

21    a.m. with its lights off and immediately began driving away when the officer turned his patrol

22    vehicle's headlights toward defendant), *cert. denied sub nom. Washington v. United States.*, 145

23    S. Ct. 1345 (2025); *United States v. Lopp*, 186 F. Supp. 3d 1037, 1043 (N.D. Cal. 2016) (finding

24    that the defendant was not engaged in flight where she "drove away at a normal speed in the same

25    direction her car was facing."); *United States v. Gray*, No. 2:11-cr-00143-JCM-VCF, 2012 WL

---

26    [12] "[T]he Supreme Court has never endorsed a *per se* rule that flight establishes reasonable

27    suspicion.  Instead, the Court has treated flight as just one factor in the reasonable suspicion
    analysis, if an admittedly significant one."  *United States v. Brown*, 925 F.3d 1150, 1155 (9th Cir.

28    2019) (citation omitted).

1  2499328, at *7 n.4 (D. Nev. Mar. 27, 2012) (concluding that the defendant was not engaged in

2  flight since he was "not speeding or driving erratically, . . . and complied once" the officer

3  ordered him to stop the vehicle).

4          Because the government's claim of flight by the defendant Nassar is completely

5  unsupported by the evidence, including Officer Hanna's own testimony, flight cannot serve as a

6  basis upon which to find a reasonable suspicion justifying this vehicle stop.

7          3.       The Remaining Circumstances

8          The government also contends that Officer Hanna had reasonable suspicion to initiate the

9  investigatory stop because:  (1) defendant drove to the rear parking lot of the Kaiser Office which

10  was obscured from view of the main road; (2) at 4 a.m.; (3) the Kaiser Office was closed and

11  located on private property; and (4) these observations indicated that defendant was likely

12  committing, or about to commit, a variety of possible crimes including:  vehicle burglary, vehicle

13  tampering, drug possession, trespassing, or loitering.  (Doc. No. 32 at 10–11.)

14          Notably, however, Officer Hanna testified that he did not personally observe any activity

15  that indicated that a crime was occurring or about to occur before he initiated the vehicle stop.

16  *See United States v. Elias*, No. 8:17-cr-00250, 2018 WL 3626440, at *3 (D. Neb. May 29, 2018)

17  (finding no reasonable suspicion for investigatory stop in part because there was no indication

18  that the suspects were engaged in criminal activity), *report and recommendation adopted*, No.

19  8:17-cr-00250, 2018 WL 3625771 (D. Neb. July 30, 2018); *United States v. Henley*, No. 13-cr-

20  001249-TUC-CKJ (HCE), 2013 WL 6628297, at *8, *11 (D. Ariz. Dec. 17, 2013) (noting that the

21  "particularized and objective basis" for reasonable suspicion is "law enforcement's personal

22  observations and law enforcement's knowledge that a crime has been committed" and concluding

23  that nothing the officers observed in that case supported "an inference that Defendant was

24  involved in criminal activity"); *see also Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1079) (a

25  reasonable suspicion cannot be founded on inarticulable hunches or general suspicions).  In

26  addition, Officer Hanna admittedly did not take steps to rule out the possibility that defendant had

27  a lawful purpose for being on the Kaiser Office property.  *See United States v. Brown*, 996 F.3d

28  998, 1007 (9th Cir. 2021) (finding that the officer lacked reasonable suspicion to conclude that

the defendant was likely engaged in criminal activity when the officer observed him simply sitting in a motel parking lot).

The government cites to a number of cases involving investigatory stops in parking lots late at night to support its argument that Officer Hanna had reasonable suspicion to initiate this vehicle stop.  (Doc. No. 37 at 7 n.1 n.2 n.3.)  However, an examination of those cases reveals that each involved other circumstances supporting a reasonable suspicion of criminal activity afoot that are absent here.  *United States v. Salcido*, 341 F. App'x 344 (9th Cir. 2009) (finding no error by the district court's conclusion of a reasonable suspicion of criminal activity where the defendant's vehicle was sitting alone in the empty parking lot of a post office, a location where mail theft crimes had historically occurred, near midnight when it was unusual for vehicles to be present and, importantly, where the vehicle's headlights were off and only turned on as it exited the lot); *United States v. Betts*, 806 Fed. App'x. 426, 430 (6th Cir. 2020) (finding that reasonable suspicion existed where the defendant was in a parking lot of closed businesses where prior burglaries had occurred, late at night, and was "pacing" around on a cold night); *United States v. Trogdon*, 789 F.3d 907, 910-11 (8th Cir. 2015) (concluding that the officer had reasonable suspicion to conduct an investigatory stop in a parking lot late at night where the suspects walked away as soon as the officer arrived and the officer observed the defendant drop something on the ground); *United States v. Salazar*, 609 F.3d 1059, 1069 (10th Cir. 2010) (finding that a reasonable suspicion existed where, among other things, the defendant engaged in evasive behavior); *United States v. Barnett*, 505 F.3d 637, 638 (7th Cir. 2007) (reasonable suspicion was supported by defendant's nervous and startled presentation when the officers approached him in their patrol vehicle); *United States v. Edmonds*, 240 F.3d 55, 60 (D.C. Cir. 2001) (defendant made "furtive gestures" as the officers approached his vehicle in a school lot after hours); *United States v. Dawdy*, 46 F.3d 1427, 1429-30 (8th Cir. 1995) (defendant started his car and attempted to leave once the officers approached, and made affirmative efforts to avoid them even when the officer signaled for defendant to stop); *United States v. Walker*, 924 F.2d 1, 4 (1st Cir. 1991); *United States v. Walker*, 924 F.2d 1, 4 (1st Cir. 1991) (vehicle located in a parking lot at a time of day when vehicles usually were not present); *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir.

1991) (defendant evaded the officer in exiting the parking lot); *People v. Leyba*, 29 Cal. 3d 591, 598-600 (1981) (officer observed vehicles flash their headlights at one another late at night in a parking lot where gang activities and burglaries occurred); *People v. Souza*, 9 Cal. 4th 224, 240 (1994) (defendant fled when officer fixed his patrol vehicle spotlight into a vehicle).  The court finds the authorities relied upon by the government to simply be inapplicable to the present case in light of the evidence.

Here, Officer Hanna observed defendant drive into the parking lot of a closed business at 4:00 a.m. where he remained for only approximately three minutes before re-emerging.  Such observations might have given Officer Hanna a hunch that further investigation was appropriate.  However, he conducted none.  Officer Hanna viewed no other vehicles near defendant Nassar's when he arrived that could have been the subject of a break-in or of gas siphoning during defendant's approximate three-minute stay in the parking lot.  The officer admittedly saw nothing whatsoever indicating that a crime had been or was being committed.  His hunch or suspicion that something might be amiss was not sufficient to establish a reasonable suspicion that the vehicle's occupant had engaged or was planning to engage in any unlawful activity.  Accordingly, the court concludes that Officer Hanna lacked reasonable suspicion to conduct the investigatory stop.

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

/////

Therefore, defendant Nassar's motion will be granted and all of the evidence that was obtained as a result of the unlawful vehicle stop on November 17, 2023, will be suppressed.[13] This, however, does not end the court's analysis.  Below, the court turns to address whether the exclusionary rule calls for the suppression of all the evidence that was subsequently obtained by law enforcement during the ongoing federal investigation as the fruit of the unlawful vehicle stop.

**B.    The Exclusionary Rule & the Scope of Suppression of Evidence Here**

Defendant contends that all of the evidence seized during the November 17, 2023 vehicle stop and his arrest, as well as the evidence seized pursuant to seven federal search warrants obtained during the government's ongoing investigation of him thereafter should be suppressed as stemming directly from the unlawful stop.  (Doc. No. 30 at 6–13.)  In opposition, the government argues that the subsequently obtained evidence should not be suppressed because:  (1) the subsequent search warrants were based on independent information separate and apart from the vehicle stop; and (2) the FBI and BGC searches of defendant's cell phones seized on November 17, 2023, from defendant's vehicle, as well as the evidence seized as a result of his arrest for violation of his federal term of supervised release in January 2024, were sufficiently attenuated from the vehicle stop to diminish any taint flowing therefrom.  (Doc. No. 32 at 13–15 and n.

---

[13]  Defendant moves to suppress the following evidence that was recovered on November 17, 2023, following the stop of defendant Nassar's vehicle and his arrest:  (1) suspected stolen mail; (2) mail addressed to David L. Scott; (3) one Discover check in the name of David Scott dated November 1, 2023 made out to Mohdjamal; (4) one Discover check issued by a David Scott dated November 16, 2023 made out to Mohdjamal; (5) mail addressed to Mashal, Fathia Salama, defendant Nassar, and Atik Aman; (6) mail addressed to Jimmie Jordan, Fathia Salama, defendant and Atik Aman; (7) alleged fictitious checks; (8) card scanning devices; (9) an MSRX6 Credit Card reader; (10) a Flipper RFID reader; (11) "numerous access cards not in [defendant's] name"; (12) 35 debit and credit cards in the names of Fred Hamann, Maher Nassar, Mashal, Jimmie Jordan, Housenieh Dawud, Housnia Dawud, Nai Saephanh, Trinity Davis, Fadah Nassar, Ahmad, Angelina Thavisack, Iman Karajah, Amer Bahaiddin, Betty Hopes, Zia Zafar, and Fadah Nassar; (13) three debit or credit cards in the names of defendant Nassar, Mashal, Housnia Dawud, along with a State of California Benefits card; (14) a Chase Business Premier Card with three names listed on it including defendant Nassar and Y.P.; (15) a white plastic insurance policy card with the letters H.D. for a 2017 Mercedes C63 AMG S; (16) a Chase debit card found in defendant's wallet; (17) $6,100 cash; (18) cell phones marked EGPD #23-007463-1, -7, -28, -35, -6, -12, -13, -19, -21, -22, -23, - 24, -27, -29, -30, and -31; (18) a drone; (19) a computer; and (20) a Windows HP laptop computer, as well as the statements made by defendant Nassar to police during the traffic stop and after his arrest, including those given to Officer Hanna and a jail nurse.  (Doc. No. 30 at 7–8.)

12.)[14]   As to its first argument, the government contends in conclusory fashion[15] that even if all reference to the November 17, 2023 vehicle stop is excised from the federal search warrant affidavits, probable cause for the issuance of those warrants was still established and suppression of the evidence seized pursuant to those warrant is not warranted.  (Doc. No. 37 at 12–13.)

Below, the court will address the applicable legal standards with respect to the exclusionary rule as well as the independent source and attenuation exceptions and apply those standards to the evidence presented on the motion to suppress in this case.

It is axiomatic that:

> The typical remedy for a Fourth Amendment violation is the exclusion of evidence discovered as a result of that violation from criminal proceedings against the defendant.  *Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).  This rule—the exclusionary rule—encompasses evidence directly "seized during an unlawful search" as well as "[e]vidence derivative of a Fourth Amendment violation—the so-called 'fruit of the poisonous tree.'"  *United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017) (quoting *Wong Sun*, 371 U.S. at 484, 488).

*United States v. Garcia*, 974 F.3d 1071, 1075 (9th Cir. 2020) (alteration in original) (internal citations omitted); *see also Chong v. United States*, 112 F. 4th 848, 855 (9th Cir. 2024); *United*

---

[14]   As noted, at the evidentiary hearing, Agent Walker testified that the FBI was initially informed of defendant engaging in unlawful conduct by a CI, described to some degree what the CI told him and Agent Norgaard, and explained how that interview prompted the FBI in February 2024, to launch an investigation into defendant's activities.  However, Agent Walker was unable to recall the details of that initial interview of the CI.  He did recall, however, that the CI disclosed that defendant Nassar had been arrested on November 17, 2023.

[15] As indicated at the December 1, 2025 status conference, the undersigned has been frustrated by the government's briefing and approach in opposing the pending motion.  The government has simply submitted what it believes are adequately redacted search warrants affidavits and stated that they "plainly" provide "ample, independent probable cause supporting each of those warrants" (Doc. No. 13 at 13), without providing any analysis as to why that is the case.  As also noted at that hearing, the defense argument too has not been entirely helpful because it has been based primarily on the proposition that because the subsequent search warrant affidavits stated that the federal investigation began with the November 17, 2023 vehicle stop, all the evidence seized pursuant to those warrants is tainted by the initial illegality.  The court is unpersuaded by this defense argument, which may get the defense to first base of the analysis but by no means qualifies as a home run.  *See United States v. Lancaster*, No. 3:24-cr-00010-ART-CLB, 2025 WL 3171392, at *5 (D. Nev. Nov. 13, 2025) ("It is a defendant's initial burden to show specific evidence demonstrating an unconstitutional taint" only then does the burden shift "to the government to show that it acquired its evidence from an independent source.'")

16

*States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) ("Searches and seizures that offend the Fourth Amendment are unlawful and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the poisonous tree' and is inadmissible under the exclusionary rule.").

Similarly, it is well established that:

> Evidence derivative of a Fourth Amendment violation—the so-called "fruit of the poisonous tree," [*Wong Sun*, 371 U.S. at 488]—is ordinarily "tainted" by the prior "illegality" and thus inadmissible, subject to a few recognized exceptions. *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007).
>
> * * *
>
> We explained that evidence qualifies as the "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." [*United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989)] (quoting *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir.1980)). "The focus," in other words, "is on the causal connection between the illegality and the evidence." *Id*. (citation omitted). Because "[t]he illegal stop was the impetus for the chain of events leading to the marijuana," the marijuana evidence was inadmissible. *Id*. at 245–46. We also noted in *Johns* that "the burden of showing admissibility rests on the prosecution." *Id.* at 245 (quoting *Chamberlin*, 644 F.2d at 1269).

*United States v. Gorman*, 859 F.3d 706, 716 (9th Cir. 2017), *order corrected*, 870 F.3d 963 (9th Cir. 2017); *see also United States v. Perez*, 506 F. App'x 672, 675 (2013).

Pursuant to these well recognized principles, if an "illegal stop was the impetus for the chain of events leading to" subsequently discovered evidence, then that evidence must be suppressed. *Gorman*, 859 F.3d at 716 (citing *Johns*, 891 F.2d at 245–46). The Supreme Court, however, has recognized exceptions to the exclusionary rule.

> Three of these exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence. First, the independent source doctrine allows trial courts to admit evidence obtained in an unlawful search if officers independently acquired it from a separate, independent source. *See Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L.Ed.2d 472 (1988). Second, the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source. *See Nix v. Williams,* 467 U.S. 431, 443–444, 104 S. Ct. 2501, 81 L.Ed.2d 377 (1984). Third, . . . is the attenuation doctrine: Evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that "the

17

1

2

3

> interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." [*Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 165 L.Ed.2d 56 (2006)].

4  *Utah v. Strieff*, 579 U.S. 232, 238 (2016).  As noted above, it is the government's burden to

5  establish that one of these exceptions applies in a given case.  *See United States v. Baker*, 58 F.4th

6  1109, 1122 (9th Cir. 2023) (concluding that the government had failed to meet its burden of

7  showing attenuation between the illegal search and seizure and the discovery of the evidence in

8  that case); *United States v. Saelee*, 51 F.4th 327, 335 (9th Cir. 2022) (recognizing that when

9  claiming an independent source for a search warrant the government's burden of proving that no

10  information gained from the Fourth Amendment violation affected either the agents' decision to

11  seek the warrant or the magistrate judge's decision to issue it); *United States v. Ngumezi*, 980

12  F.3d 1285, 1291 (9th Cir. 2020) ("[t]he government has the burden to show that the evidence is

13  not 'the fruit of the poisonous tree,'" and here the government has made no effort to do so.")

14  (quoting *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000)); *United States v. Ramirez*,

15  976 F.3d 946, 960 (9th Cir. 2020) ("The government has the burden of showing the taint of the

16  constitutional violation is attenuated such that the evidence is admissible.") (citing *Washington*,

17  490 F.3d at 777).

18      Here, the government relies only upon two of these exceptions–independent source and

19  attenuation–in opposing defendant Nassar's motion to suppress evidence.[16]  Below the court

20  address both exceptions and whether they apply here in light of the evidence presented by the

21  government here.

22          1.      Independent Source

23      The government contends that the evidence obtained as a result of the execution of the

24  seven federal search warrants and defendant's supervised release violation arrest warrant, all

25  obtained after the vehicle stop, should not be excluded because each derives from a source

26  independent of the stop.  (Doc. No. 32 at 13.)  The government argues that the federal

27

28

---

[16]  These two exceptions to the exclusionary rule may sometimes overlap depending on the circumstances of the particular case.

investigation of defendant Nassar originated from a police report made, approximately one month after the vehicle stop to SPD, in which Mohdjamal and Rakan reported that someone had gained unauthorized access to the Wells Fargo and Bank of America accounts of Mohdjamal and Ahmad.  (Doc. No. 32 at 13–14.)  In reply, defendant argues that the investigation originated with the vehicle stop and his initial arrest, not the SPD report, as evidenced by the statements made by the affiants in six of the seven subsequent federal search warrant affidavits regarding the origins of the investigation.  (Doc. No. 33 at 6–7.)  In its supplemental brief, the government contends in conclusory fashion that a review of the search warrant affidavits establishes that there was probable cause supporting issuance of those warrants even if all reference to the November 17, 2023 vehicle stop is excised.  (Doc. No. 37 at 12–13.)

Under the independent source doctrine, "suppression is unwarranted, even where evidence was initially discovered during, or as a consequence of, an unlawful search, when that evidence is later obtained independently[,] from activities untainted by the initial illegality."  *Saelee*, 51 F.4th at 335 (alteration in original) (internal quotation marks omitted) (citing *Murray v. United States*, 487 U.S. 533, 537 (1988)).  In keeping with this principle, "[a] search warrant isn't rendered invalid merely because some of the evidence included in the affidavit is tainted."  *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014) (citing *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994)); see also *United States v. Giraudo*, No. 14-cr-00534-CRB, 2017 WL 3033605, at *4 (N.D. Cal. July 18, 2017) ("That an underlying violation contributed in some way to the discovery of challenged evidence is not enough.  To the contrary, it must be that, but for the violation, the government would not have obtained the evidence at all.") (citation omitted).  In such circumstances, a reviewing court is to excise all reference to Fourth Amendment violations from the warrant application and determine whether the remaining evidence supports a finding of probable cause.  *United States v. Artis*, 919 F.3d 1123, 1132 (9th Cir. 2019); *see also Nora*, 765 F.3d at 1058; *United States v. Heckenkamp*, 482 F.3d 1142, 1149 (9th Cir. 2007) ("In order to determine whether evidence obtained through a tainted warrant is admissible, '[a] reviewing court should excise the tainted evidence and determine whether the remaining untainted evidence

/////

19

1   would provide a neutral magistrate with probable cause to issue a warrant.'") (quoting *Reed*, 15

2   F.3d at 933).[17]

3        Both parties have submitted copies of the supporting affidavits and the federal search

4   warrants obtained and executed after defendant's November 17, 2023 vehicle stop and arrest.

5   (*See* Doc. Nos. 31-4, 31-5, 31-6, 31-7, 31-8, 31-9, 31-10, 37-1, 37-2, 37-3, 37-4, 37-5, 37-6, 37-

6   7.)  Below the court will examine those warrants and determine whether in each instance the

7   supporting affidavit established probable cause when all reference to the November 17, 2023

8   vehicle stop is excised.

9              a.    *March 28, 2024 Search Warrant for Cell Phones, Debit Cards,*

10                  *Identification Cards, and Miscellaneous Documents (2:24-sw-00329-CKD)*

11       On March 28, 2024, Agent Norgaard applied for a warrant to search cell phones that were

12  seized by EGPD during defendant Nassar's arrest on November 17, 2023, as well as to search and

13  seize cell phones, credit cards, and miscellaneous documents recovered from defendant when he

14  was arrested on January 20, 2024, pursuant to a federal arrest warrant for violating the conditions

15  of his federal term of supervised release.[18]  (Doc. Nos. 31-4, 37-1.)  It appears items from both

16  /////

---

17  [17]  This framework is consistently applied in determining whether the independent source

18  exception precludes suppression of evidence that was obtained pursuant to a warrant where the
    application included tainted evidence.  *See e.g.*, *United States v. Washington*, 700 F. App'x 619,

19  621 (9th Cir. 2017) "To apply the [independent source] doctrine in the context of a warrant issued
    based on illegally obtained information, the court must ask:  (1) whether there was probable cause

20  without the tainted evidence, and (2) whether the officers would have sought a warrant without
    having seen the tainted evidence."); *United States v. Vicente Arauza*, No. 2:18-cr-00202-TLN,

21  2020 WL 3402408 (E.D. Cal. June 19, 2020) (applying the decision in *Nora* in analyzing whether
    the independent source exception applied); *United States v. Richardson*, No. 18-cr-00110-BLG-

22  SPW-TJC, 2019 WL 2029484, at *4 (D. Mon. Feb. 12, 2019); *United States v. King*, 560 F. Supp.
    2d 906, 920 (N.D. Cal. 2008); *United States v. Wells*, No. 3:13-cr-00008-RRB-JDR, 2014 WL

23  12795575, at *18 (D. Alaska Jan. 16, 2014).

24

25  [18]  Specifically, the items for which authorization to search and seize was sought were the four
    cell phones that were seized from defendant's vehicle on the night of his November 17, 2023

26  arrest, as well and (1) three cellphones; (2) eight debit cards not in defendant's name; (3) three
    identification cards; (4) a piece of paper with various information; and (5) two pieces of unopened

27  mail from Bank of America addressed to someone other than defendant that were recovered from
    defendant when he was arrested on a federal supervised release violation petition and warrant on

28  January 20, 2024.  (Doc. Nos. 31-4 at 11; 37-1 at 9.)

police encounters were placed into defendant's property at the Sacramento County Main Jail. (*Id.*)

After excising all reference to the November 17, 2023 vehicle stop and evidence directly obtained from that stop, the affidavit in support of this search warrant is summarized as including the following. In 2019, defendant was convicted of: (1) unlawful possession of 15 or more access devices; (2) aggravated identity theft; and (3) felon in possession of a firearm after a joint investigation conducted by the FBI and BGC. (Doc. Nos. 31-4 at 6; 37-1 at 4.) On December 28, 2023, Mohdjamal contacted SPD and reported that the bank accounts of he and his recently deceased brother, Ahmad, had been drained of funds and additional unauthorized accounts had been opened in their names. (Doc. Nos. 31-4 at 7; 37-1 at 5.) Rakan, Ahmad's son and Mohdjamal's nephew, began working with bank investigators to investigate the fraudulent activity. (Doc. Nos. 31-4 at 7; 37-1 at 5.) During one meeting with bank investigators, a friend of Rakan's was present and she identified defendant Nassar in ATM surveillance photographs that had captured an individual allegedly engaging in fraudulent activity in connection with the compromised bank accounts. (Doc. Nos. 31-4 at 7–8; 37-1 at 5–6.)

Telephone records revealed that the phone number previously associated with Ahmad's business had been ported to a phone connected to Jafar Nassar, who shared two addresses with defendant Nassar: (1) an address that appeared on defendant Nassar's driver's license; and (2) an address that matched defendant's former employer. (Doc. Nos. 31-4 at 8; 37-1 at 5.) That phone number had significant contacts with three separate phone numbers that had contacted defendant Nassar while he was in custody at the Sacramento County Main Jail. (Doc. Nos. 31-4 at 8; 37-1 at 6.)

In July 2023, an individual whom Agent Norgaard believed to be defendant Nassar attempted to obtain a cash advance at a casino using a California ID card with someone else's name and a credit card with the names "Y.P." and "Ahm S Nassar." (Doc. Nos. 31-4 at 8; 37-1 at 6.) The individual abandoned those ID cards at the casino, they were never questioned about the attempted transaction, and no report was filed with authorities because there was no surveillance footage of the incident. (Doc. Nos. 31-4 at 8–9; 37-1 at 6–7.) On December 11, 2023, a warrant

1  was issued for defendant's arrest on a petition alleging that he had violated his federal term of

2  supervised release.  (Doc. Nos. 31-4 at 12; 37-1 at 10.)  Defendant Nassar was not arrested on that

3  warrant until January 20, 2024 by EGPD at the Sky River Casino.  (Doc. Nos. 31-4 at 12; 37-1 at

4  10.)  Upon being booked, the three cell phones, eight debit cards, three identification cards, piece

5  of paper with varying financial information, and two unopened pieces of mail were placed into

6  his property at the Sacramento County Mail Jail. [19]  (Doc. Nos. 31-4 at 13; 37-1 at 9.)

7      Of course, "[a search] warrant must be supported by probable cause—meaning a 'fair

8  probability that contraband or evidence of a crime will be found in a particular place based on the

9  totality of circumstances.'"  *United States v. Kvashuk*, 29 F.4th 1077, 1085 (9th Cir. 2022)

10  (quoting *United States v. King*, 985 F.3d 702, 707 (9th Cir. 2021)); *see also Florida v. Harris,*

11  568 U.S. 237, 244, (2013) ("All we have required is the kind of 'fair probability' on which

12  'reasonable and prudent [people,] not legal technicians, act.'"); *Illinois v. Gates*, 462 U.S. 213,

13  238 (1983) (probable cause is satisfied where "there is a fair probability that contraband or

14  evidence of a crime will be found in a particular place."); *United States v. Struckman*, 603 F.3d

15  731, 739 (9th Cir. 2010); *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (probable

16  cause means "fair probability," not certainty or even a preponderance of the evidence).  The

17  probable cause standard has been recognized as inherently "incapable of precise definition or

18  quantification into percentages because it deals with probabilities and depends on the totality of

19  the circumstances." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).  Nevertheless, "the substance

20  of all the definitions of probable cause is a reasonable ground for belief."  *Id.*

---

21  [19]  In its submission of the warrant application, the government includes Agent Norgaard's
22  reference to the telephonic phone interviews that the EGPD conducted with four individuals
    whose names were listed on several of the credit cards and pieces of mail that were recovered
23  from defendant's vehicle on the November 17, 2023 arrest.  (Doc. No. 37-1 at 10.)  One of those
    individuals was Mashal.  (Doc. Nos. 31-4 at 14; 37-1 at 12.)  However, that evidence was
24  obtained as a direct result of the unlawful vehicle stop and the court will excise all reference to
    interviews with individuals whose names appeared on the cards found in defendant's vehicle at
25  the time of his November 17, 2023 arrest as well in re-testing the affidavit for probable cause.
    *See United States v. Keel*, No. 1:16-cr-00187-CAP-JKL, 2017 WL 9477638, at *5 (N.D. Ga. Feb.
26  8, 2017) (ignoring all "information that officers learned from the search" in excising a warrant),
    *report and recommendation adopted*, No. 1:16-cr-00187-CAP-JKL, 2017 WL 1371870 (N.D. Ga.
27  Apr. 17, 2017); *see also United States v. Hay*, 1:19-cr-00170-RJA-MJR, 2024 WL 1683910, at *6
28  (W.D.N.Y. Feb. 23, 2024).

As to this warrant affidavit, after excising the tainted evidence stemming from the unlawful vehicle stop, the remaining untainted evidence failed to establish probable cause to issue a warrant to search and seize the very cell phones that were seized from defendant Nassar on November 17, 2023. First, after excising all reference to the unlawful stop the affidavit would lack any reference to those four cell phones at all. Probable cause is lacking from this affidavit, once excised, to seize and search these four cell phones that came into law enforcement's possession directly and solely as a result of the unlawful vehicle stop on November 17, 2023.

As indicated in the supporting affidavit, however, the remainder of the evidence addressed in this search warrant application was located at the Sacramento County Main Jail in defendant Nassar's personal property as a result of his January 20, 2024 arrest for violating the terms and conditions of his federal supervised release term. (Doc. Nos. 31-4 at 12–13; 37-1 at 10–11.) The government argues that suppression is inappropriate because there is nothing from the "infirmity of EGPD's November 17, 2023 arrest that can affect or excuse Nassar's failure to notify his probation officer of that law enforcement contact." (Doc. No. 32 at 15 n.12.) This single argument advanced by the government is persuasive.

The evidence before the court is that defendant Nassar's federal probation officer was notified on November 17, 2023 of his arrest by EGPD. When, by December 8, 2023, he still had not reported that law enforcement contact to her, the probation officer filed a petition charging defendant Nassar with violating the conditions of his supervised release by having failed to report the law enforcement contact to her as required. (Case No. 2:17-cr-00104-DAD-1, Doc. No. 94 at 2–3.)[20]

It is the court's conclusion that this ground of the violation petition and federal arrest warrant that issued are sufficiently independent from the unlawful vehicle stop to dissipate the taint therefrom. Defendant Nassar was required under the standard terms of his supervised release to report his contact with law enforcement on November 17, 2023, whether the vehicle stop was lawful or not. He failed to do so. His federal probation officer waited for three weeks

_____

[20] The violation petition also charged defendant Nassar with a new violation based upon the evidence obtained during the November 17, 2023, vehicle stop.

after learning of defendant Nassar's contact with police, clearly providing him sufficient time to report that contact as required. Only after that temporal delay did the probation officer file the violation petition and seek a warrant for his arrest. Moreover, defendant Nassar was not arrested on that warrant until approximately six weeks after it was issued. The court finds that under these unique facts, the federal arrest warrant for a violation of supervised release was an intervening event sufficient to break the connection between the unlawful vehicle stop and defendant Nassar supervised release violation arrest as well as the search and seizure incident thereto.

The Ninth Circuit has held that in determining whether the taint of an initial Fourth Amendment violation has been purged the court is to consider "the temporal proximity" of the illegal conduct and the evidence in question, "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct." *Gorman*, 859 F.3d at 718 (internal citations omitted); *Rosales v. Oliver*, No. 23-15081, 2025 WL 1248818, at *2 (9th Cir. Apr. 30, 2025) (listing temporal proximity, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct as among the factors to be considered) (citing *Garcia*, 974 F.3d at 1076); *see also Wong Sun*, 371 U.S. at 491 (finding the defendant's confession to be admissible despite his unlawful arrest because he made the statement upon voluntarily meeting with police after being arraigned and released on his own recognizance);; *United States v. Wrensford,* 866 F.3d 76, 88, n.5 (3rd Cir. 2017) (in determining whether potential intervening events dissipate the taint of unlawful action "courts may consider, among other things, whether the evidence was 'obtained by exploitation of an illegal arrest,' the 'temporal proximity between the arrest and' collection of the evidence, 'the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct . . ..'") (quoting *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975)); *United States v. Loveland*, No. 07-438 (JRT/JJG), 2008 WL 3200648, at *4 (D. Minn. Aug. 5, 2008) ("But under the 'independent source' doctrine, if an intervening event establishes another lawful reason to obtain the evidence, then the prior taint of illegal misconduct is purged and the evidence becomes admissible.") Consideration of these factors here lead the undersigned to conclude that the supervised release violation arrest was independent of the unlawful vehicle stop.

Here, defendant Nassar's voluntary failure to report his contact with police to his supervising probation officer as was required, and the subsequent issuance of a federal warrant for his arrest, was an intervening event sufficient to break the causal chain linking that arrest to the unlawful vehicle stop.  That arrest occurred two months after the vehicle stop, was carried out in an already existing case prosecuted in this court and was sought by a federal probation officer and not by the EGPD officer who had stopped defendant Nassar's vehicle.  In this way, the issuance of the federal arrest warrant for the supervised release violation was independent of the legality of the vehicle stop.

Therefore, the court concludes the complete excision of (Doc. Nos. 31-4 at 12–13; 37-1 at 10–11) from the affidavit in support of this warrant is not required.  Considering that information, the court also concludes that probable cause existed for the search and seizure of the (1) three cellphones; (2) eight debit cards not in defendant's name; (3) three identification cards; (4) a piece of paper with various information; and (5) two pieces of unopened mail from Bank of America addressed to someone other than defendant that were recovered from defendant Nassar when he was arrested on a federal supervised release violation petition and warrant on January 20, 2024.  Accordingly, defendant Nassar's motion to suppress that and any other seized pursuant to this search warrant will be denied.

b.    *January 16, 2025 Warrant to Seize the 2015 Mercedes C63 AMG (2:25-sw-00052-CKD)*

On February 5, 2025, Agent Norgaard applied for a federal warrant to seize a Mercedes-Benz (the "Subject Vehicle" or "Mercedes").  (Doc. Nos. 31-5, 37-2.)  Once all reference to the November 17, 2023 vehicle stop and the evidence obtained therefrom is excised from that warrant application, the affidavit in support of that seizure warrant provides the following information.

As with the prior warrant, this warrant affidavit details the reports of fraudulent activity in connection with the bank accounts of Mohdjamal and Ahmad and their subsequent cooperation with bank investigators and the FBI.  (Doc. Nos. 31-5 at 9–10; 37-2 at 8–9.)  A total of $793,663 was withdrawn without authorization from those bank accounts.  (Doc. Nos. 31-5 at 10; 37-2 at 9.)  Of the total amount stolen, $354,675 came from ATM withdrawals and electronic payments

to credit cards in Mashal's name from Mohdjamal's Wells Fargo and Bank of America accounts. (Doc. Nos. 31-5 at 10; 37-2 at 9.)  Another $212,319 was transferred out of Mohdjamal's Wells Fargo savings account to four checking accounts in his name that were opened without his authorization or knowledge in June 2023. (Doc. Nos. 31-5 at 10; 37-2 at 9.)  A review of Ahmad and Mohdjamal's bank records during the period at issue revealed that on August 17, 2023, two electronic payments equal to the value of the Subject Vehicle were made from Mohamad's Bank of America Account to Carvana LLC. (Doc. Nos. 31-5 at 10; 37-2 at 9.)  Agent Norgaard identified defendant Nassar withdrawing funds from those four checking accounts as captured on Wells Fargo surveillance footage. (Doc. Nos. 31-5 at 10; 37-2 at 9.)

On July 26, 2024, investigators interviewed Mashal. (Doc. Nos. 31-5 at 12; 37-2 at 11.)  She revealed that in July 2023, defendant Nassar offered to help her address certain financial difficulties that she was facing, but that he would need her to provide him with her credit cards in order to do so. (Doc. Nos. 31-5 at 13; 37-2 at 12.)  Mahshal gave defendant four of her credit cards, of which maintained possession. (Doc. Nos. 31-5 at 13; 37-2 at 12.)  She also revealed that defendant purchased a vehicle in her name while she was in Jordan. (Doc. Nos. 31-5 at 13; 37-2 at 12.)  Mashal further stated that during this time, she would meet defendant Nassar at different stores where he would purchase items for her with credit cards that were in her name. (Doc. Nos. 31-5 at 13; 37-2 at 12.)  When asked about Mohdjamal, Mashal stated that she had never even hear of his name before. (Doc. Nos. 31-5 at 13; 37-2 at 12.)  On January 17, 2024, Agent Norgaard observed the Mercedes parked in the driveway at defendant Nassar's residence. SPD contacted defendant in the Subject Vehicle in responding to a suspicious vehicle report on

/////

/////

/////

/////

/////

/////

/////

December 2, 2024. (Doc. No. 31-5 at 9; 37; 37-2 at 7–8.)[21] California DMV records indicated that the Subject Vehicle was registered to defendant Nassar at an Elk Grove, California address. (Doc. Nos. 31-5 at 13; 37-5 at 12.)

Following appropriate redaction of the supporting affidavit, the court concludes that there is sufficient probable cause to support the issuance of a warrant to seize the Subject Vehicle. A review of the bank records revealed that there were a significant number of charges and transfers of funds made from Ahmad's account to Mashal. Moreover, when Akan reviewed his father and uncle's bank records with investigators, there were two specific purchases made to Carvana in an amount equal to the purchase price of the Subject Vehicle, and during an interview with investigators, Mashal revealed that defendant purchased a vehicle in her name. Also, Mashal told investigators that she was unfamiliar with Mohdjamal despite there being a significant number of transactions from Mohdjamal's account to credit cards in Mashal's name.

The next question that the court must answer is whether the warrant affiant would have sought a warrant to seize the Subject Vehicle if all reference to the tainted evidence is excised. *Washington*, 700 F. App'x at 621. Here, the court concludes that Agent Norgaard would have obtained the seizure warrant even without any reference to the initial stop and the Carvana inquiries. Indeed, the Carvana purchase was discovered during a review of Mohdjamal's bank

---

[21]  The supporting affidavit also included information pertaining to law enforcement's review of records obtained by Carvana which indicated that another individual, I.K., purchased the Subject Vehicle on Mashal's behalf and I.K.'s subsequent interview with federal agents. (Doc. No. 37-2 at 5–7.) However, during the unlawful vehicle stop, an insurance card tied to the Subject Vehicle was found in defendant's possession. In opposing the pending motion, the government provided no argument to suggest that the agents' subsequent inquiry into Carvana information was not directed by and tainted by the insurance card that was seized during the unlawful stop. The court again notes, establishing the applicability of any exception to the exclusionary rule is the government's burden. *See Baker*, 58 F.4th at 1122; *Saelee*, 51 F.4th at 335. The government has had multiple opportunities to attempt to make such a showing as to this warrant but did not do so. The government did not call affiant Norgaard as a witness at the evidentiary hearing, called only Agent Walker who was not prepared to address these subjects, and has advanced no analysis of its version of the redacted affidavit and why it established probable cause. Nor is there any indication that the Carvana transactions were noted in the SPD report. The court finds that the most logical inference to draw is that the unlawful vehicle stop and the discovery of the insurance card related to the Mercedes prompted and directed the agents' Carvana inquiry. Thus, all of the information gained as a result of that inquiry will be excised from the supporting affidavit for purposes of re-testing.

1 records, Mashal's name appeared on many transactions during the period in question, which

2 independently flagged her as a person of interest for investigators to be interviewed. This

3 information was derived independently of the information that was obtained from the November

4 2023 stop.

5       Accordingly, defendant Nassar's motion to suppress any and all evidence obtained as a

6 result of the Subject Vehicle seizure warrant, as well as all evidence seized pursuant to search

7 warrant 2:25-sw-00100 directed at the items recovered from the Subject Vehicle following its

8 seizure, will be denied.[22]

9       c.    *March 3, 2025 Warrant to Search Defendant's Home (2:25-sw-00197-*

10                   *CKD)*

11       On March 3, 2025, FBI Special Agent Danielle Woodfint sought a search warrant for

12 defendant Nassar's home (the "Target Address").[23] (Doc. Nos. 31-7, 37-4.) Agent Woodfin's

13 affidavit in support of the issuance of that search warrant included the following.

14       The "FBI and BGC investigated and gathered evidence that, beginning in 2023,

15 [defendant] was involved in the unauthorized takeover of bank accounts belonging to" Ahmad

16 and Mohdjamal. (Doc. Nos. 31-7 at 6; 37-4 at 5.) Defendant informed his probation officer that

17 the Target Address is his residence. (Doc. Nos. 31-7 at 13; 37-4 at 12.) Discussions with

18

19 [22] Defendant seeks suppression of at least sixteen categories of evidence purportedly stemming
from the execution of this warrant. (Doc. No. 30 at 11.) However, in line with the approach

20 followed by both parties, defendant has provided a fairly limited analysis as to how this evidence
is the fruit of the unlawful vehicle stop. Rather, as previously noted, defendant primarily argues

21 that all evidence should be suppressed because the entire investigation started with the initial
EGPD stop. As noted, the court is unpersuaded by this argument particularly because it is

22 defendant who bears the burden to establish that all of this evidence was discovered in violation
of the Fourth Amendment. *United States v. Ped*, No. 16-cr-00775-JAK, 2017 WL 11593374, at

23 *3 (C.D. Cal. July 31, 2017) ("As the moving party, Defendant bears the burden of demonstrating

24 that the evidence he seeks to suppress was discovered and seized in violation of his Fourth
Amendment rights."), *aff'd sub nom. United States v. Ped*, 943 F.3d 427 (9th Cir. 2019).

25

26 [23] The warrant application sought to search defendant Nassar's residence for:  credit cards in the
name of others, records containing personally identifying information or account information of

27 persons other than defendant, access device information, electronic communications connected to
the fraudulent activity, computers, and network equipment that connected computers to the

28 internet. (Doc. No. 31-7 at 36–38.)

defendant's probation officer, other agents, database checks, and surveillance, disclosed that there were two other adults and four minors living at the Target Address along with defendant.  (Doc. Nos. 31-7 at 13; 37-4 at 12.)  After the Subject Vehicle was seized, the FBI and BGC conducted an inventory search of the Subject Vehicle.  (Doc. Nos. 31-7 at 6; 37-4 at 5.)  During the inventory search, the agencies recovered the following pieces of evidence:  (1) a Credit One check made out to A.A. with the Target Address as the recipient address; (2) a Chevron Business credit card for the Sacramento City Housing and Redevelopment Agency ("SCHR") bearing the name M.M.; (3) mail from the California Department of Motor Vehicles addressed to I.A. with the Target Address as the recipient address; and (4) a piece of mail from the United States Department of State made out to I.O. with the Target Address as the recipient address.  (Doc. Nos. 31-7 at 7; 37-4 at 6.)  Agents interviewed A.A. and a representative from SCHR, and it was revealed that there was no legitimate connection between defendant Nassar and A.A. nor the individual whose name appeared on the SCHR business card.  (Doc. Nos. 31-7 at 6; 37-4 at 5.)

Also recovered from the Subject Vehicle during the inventory search was a cellphone that investigators searched through and subsequently concluded that defendant Nassar was the primary user of.  (Doc. Nos. 31-7 at 6; 37-4 at 5.)  The cellphone contained chat logs on the app Telegram with a "Bot-Document Generator" in which users would provide information that would be found on a driver's license, including photos, names, date of birth, height, eye color, and hair color.  (Doc. Nos. 31-7 at 8; 37-4 at 7.)  Defendant provided this information to the Bot-Document Generator on several occasions.  (Doc. Nos. 31-7 at 8; 37-4 at 7.)  The photo library of the cellphone revealed a number of images depicting "physical cards, digital renderings, and pictures of multiple realistic documents" including commercial driver's licenses, foreign driver's licenses, foreign identity cards, passports, and U.S. ID cards.  (Doc. Nos. 31-7 at 8–10; 37-4 at 7–9.)  Some of documents depicted defendant's image, some depicted an unknown male, and others depicted an unknown female all appearing next to different names on the various documents on which they appeared.  (Doc. Nos. 31-7 at 8–10; 37-4 at 7–9.)  Also located on the cellphone were images from Prozone, which is a website offering credit card information, banking information, and personal identifying information for sale.  (Doc. Nos. 31-7 at 8; 37-4 at 9.)  The images

1   depicted credit card numbers, addresses, date of birth, and contact information for 33 individuals.

2   (Doc. Nos. 31-7 at 10–11; 37-4 at 9–10.)  Finally, there were multiple images of mail addressed

3   to the adult residents of the Target Address, including defendant Nassar, along with 13 pieces of

4   mail addressed to the Target Address in names of individuals who were not residents at the Target

5   Address.  (Doc. Nos. 31-7 at 10–11; 37-4 at 11–12.)

6       On January 27, 2025, United States Probation officers conducted a home visit at the

7   Target Address.  (Doc. Nos. 31-7 at 7; 37-4 at 6.)  During that visit, one of the probation officers

8   observed a package at the front door of the Target Address that was addressed to an individual

9   whose name was also on two unopened pieces of mail that had been recovered from defendant

10  Nassar when arrested on the supervised release violation in January 2024.  (Doc. Nos. 31-7 at 7;

11  37-4 at 6.)

12      On February 27, 2025, a BGC agent observed two vehicles registered to the two other

13  adult residents parked in front of the Target Address.  (Doc. Nos. 31-7 at 13; 37-4 at 12.)  The

14  affidavit also incorporated the search warrant application for 2:24-sw-00329-CKD, references to

15  defendant's prior fraud convictions, the SPD report and the subsequent cooperation with bank

16  investigators and the FBI provided by those who made that report.[24]  (Doc. Nos. 31-7 at 6; 37-4 at

17  4–5.)

18      Here, the warrant sought to search the residence for credit cards and records belonging to

19  others, access device information, electronic communications indicating fraudulent activity,

20  computers, and network equipment.  It is clear that the decision to obtain the warrant to search

21  this evidence was prompted by what was obtained pursuant to the inventory search of the Subject

22  Vehicle conducted after executing the seizure warrant as well as by the supervising probation

23  officer's observations.  *See Washington*, 700 F. App'x at 621.  As outlined above, the inventory

24  search of the Subject Vehicle that was conducted pursuant to the seizure warrant all flows from

---

[24]  Also included in the supporting affidavit for this warrant is reference to the evidence that was retrieved from the Mercedes when the seizure warrant was executed, interviews that the FBI conducted both with an individual whose name appeared on a card retrieved from the Mercedes, along with chat logs and numerous images of various cards attributed to other individuals that were retrieved from a phone found in the Subject Vehicle.  (Doc. Nos. 31-7 at 6–12; 37-4 at 6–11.)

independent investigations, not any evidence that was derived from the November 17, 2023 EGPD vehicle stop.  Also, the probation officer's observations were connected to information that was derived from the January 2024 supervised release arrest.  It was this independent investigation that established that this evidence of a crime would likely be discovered at the Target Address.  Therefore, the court concludes that the warrant application contains sufficient information establishing probable cause, independent of the unlawful stop, to justify the issuance of this warrant.  Moreover, because the Subject Vehicle inventory search and the probation officer's observations prompted the affiant's decision to apply for a warrant, the affiant a warrant would have been sought even if the information gained from the unlawful EGPD stop was not discovered.

Therefore, defendant's motion to suppress evidence that was obtained pursuant to the search of the Target Address will be denied.

        d.     *April 8, 2025 Search Warrant for Defendant's Cellphone Location (2:25-sw-00310-AC)*

On April 8, 2025, Agent Norgaard applied for a search warrant to obtain defendant's prospective cell phone location date.  (Doc. Nos. 31-8, 37-5.)  In his affidavit submitted in support of that warrant, Agent Norgaard reported the following.  The U.S. Probation Department had sought a warrant for defendant Nassar's arrest as a result of the evidence found during the inventory search of the Subject Vehicle on January 23, 2025, and that arrest warrant was issued on March 5, 2025 for defendant's violation of supervised release.  (Doc. No. 31-8 at 6; 37-5 at 5.)  The United States Marshal's Service, FBI, and BGC failed to locate defendant in their attempt to execute the arrest warrant.  (Doc. No. 31-8 at 6; 37-5 at 5.)  On March 26, 2025, a neighbor reported observing two women who lived with defendant Nassar moving items into a black SUV and, the following day, Agent Norgaard conducted an address check at defendant's residence where he observed many items on the street in front of defendant's home.  (Doc. No. 31-8 at 6; 37-5 at 5.)  Defendant Nassar had previously reported the cell phone's (the "Target Phone") number to his probation officer.  (Doc. No. 31-8 at 6; 37-5 at 5.)  Defendant Nassar also communicated with his probation officer from the Target Phone in March and April 2025, and

1    failed to appear for multiple scheduled probation appointments (Doc. No. 31-8 at 6–7; 37-5 at 5–

2    6.)[25]

3         In short, this warrant issued based upon an affidavit reciting the evidence that was seized

4    from the Subject Vehicle inventory search and not from the unlawful November 17, 2023 vehicle

5    stop. (*See* Doc. Nos. 31-8 at 6; 37-5 at 5.)  Therefore, defendant's motion to suppress will be

6    denied as to the evidence seized pursuant to this warrant.[26]

7              e.    *June 13, 2025 Warrant to Search the Business of Defendant's Brother-in-*

8                   *Law (2:25-sw-00506-JDP)*

9         The final federal warrant sought to search the bookkeeping business of defendant's

10   brother-in-law Alaaraj.[27]  (Doc. Nos. 31-10, 37-7.)  In his affidavit in support of the issuance of

---

11   [25]  This search warrant affidavit also properly referenced defendant's prior federal fraud
12   conviction and his term of supervised release, the seizure of the Subject Vehicle, the arrest
     warrant issued on his supervised release violation, and the search warrant issued for his residence.
13   (*Id.* at 5–6.)  None of this information was obtained as a result of the November 17, 2023 vehicle
14   stop and it need not be excised from the warrant by the court in re-testing it for probable cause.

15   [26]  In his motion, defendant appears to seek only suppression of the warrant itself.  (Doc. No. 30
16   at 12.)  The court notes that on April 24, 2025, Agent Norgaard subsequently sought a warrant,
     2:25-sw-00362-JDP, to search the contents of the Target Phone that was recovered when the
17   agents executed the March 5, 2025 warrant for defendant Nassar's arrest.  (Doc. Nos. 31-9 at 8;
     37-6 at 6.)  Defendant seeks to suppress the admission of that cellphone as well.  (Doc. No. 30 at
18   12.)  However, the court concludes that the motion to suppress as to this cellphone must be denied
     because a review of the affidavit in support of that warrant includes only a single paragraph in
19   reference to the EGPD vehicle stop, and the remaining information describes defendant's 2019
     convictions, the SPD report, the Mercedes seizure and inventory search, the rollover warrant and
20   search of the cellphone located in the Subject Vehicle during the inventory search, the search
     warrant executed at defendant's residence, the March 5, 2025 arrest warrant, and defendant's
21   April 24, 2025 arrest.  (Doc. Nos. 31-9 at 5–8; 37-6 at 4–7.)  As indicated above, all of this
     information was obtained as the result of an independent, untainted investigation.  The court
22   concludes that the warrant application contains sufficiently independent bases establishing
     probable cause that would have prompted the agent to apply for the warrant irrespective of the
23   2023 EGPD stop.  Accordingly, defendant's motion will be denied as to the warrant obtained to
24   search the Target Phone as well.

25   [27]  Though not raised by either of the parties, and not necessary to address in light of the
26   conclusion that the motion to suppress evidence obtained as a result of this warrant must be
     denied on other grounds, the court notes that there would appear to be a serious question as to
27   whether defendant Nassar lacks standing to challenge the search of his co-defendant's business in
     any event.  *See United States v. Galecki,* 89 F.4th 713, 724–25 (9th Cir. 2023); *United States v.*
28   *SDI Future Health, Inc.,* 568 F.3d 684, 695 (9th Cir. 2009).

1  this warrant FBI Agent Simmons states the following.

2          On August 21, 2024, law enforcement interviewed defendant Alaaraj, during which,

3  Alaaraj revealed that he owned two businesses:  (1) Balance Bookkeeping, through which he

4  provided tax preparation services; and (2) Atheer Investments, an appliance store.  (Doc. Nos. 31-

5  10 at 7; 37-7 at 6.)  Alaaraj maintained a Square account for both businesses until November

6  2023 when Square closed both accounts.  (Doc. Nos. 31-10 at 7; 37-7 at 6.)  Alaaraj told

7  investigators that he did tax preparation for Ahmad and Mohdjamal for seven years, typically

8  charging them $200-500 each year.  (Doc. Nos. 31-10 at 7; 37-7 at 6.)  Alaaraj did business with

9  defendant, but did not reveal any specifics of that relationship.  (Doc. Nos. 31-10 at 7; 37-7 at 6.)

10  Alaaraj previously sold appliances to defendant and Mashal, for which they sent payments to

11  Balance Bookkeeping and Atheer Investments.  (Doc. Nos. 31-10 at 7; 37-7 at 6.)  Alaaraj stated

12  that he provided tax preparation services to Mashal and her husband.  (Doc. Nos. 31-10 at 7; 37-7

13  at 6.)

14          The FBI and BGC reviewed Alaaraj's Square transaction history, which revealed that

15  between August and December 2023, approximately $100,000 was transferred from two

16  accounts, belonging to Mashal and Mohdjamal, to both of Alaaraj's Square accounts in 2023.

17  (Doc. Nos. 31-10 at 8; 37-7 at 7.)  All but five of those transactions included a tip averaging

18  $732.50.  (Doc. Nos. 31-10 at 9; 37-7 at 8.)  In May 2023 correspondence between Alaaraj and

19  Square, Alaaraj stated that the accounts were for his two businesses–Balance Bookkeeping, his

20  tax and bookkeeping business and Atheer Investments, which he then identified as his real estate

21  investment company.  (Doc. Nos. 31-10 at 9; 37-7 at 8.)  In September 2023, Square inquired

22  about a noted spike in payments and increased declined payments with respect to the Balance

23  Bookkeeping account.  (Doc. Nos. 31-10 at 9; 37-7 at 8.)  Alaaraj responded that it was corporate

24  tax filing season, and that a new customer of his had attempted to make a $23,000 payment that

25  was declined and had to be sent in split payments.  (Doc. Nos. 31-10 at 9; 37-7 at 8.)

26  /////

27  /////

28  /////

To support this explanation, Alaaraj provided Square with single invoice charging $23,220.00 for tax preparation services for Mashal and a Mohamad Fawakhiri.[28]  (Doc. Nos. 31-10 at 10; 37-7 at 9.)  On September 10, 2023, four payments matching the invoice total were made from two Wells Fargo credit cards in Mohamad's name.  (Doc. Nos. 31-10 at 10–11; 37-7 at 9–10.)  However, the invoice amount far exceeded the price Alaaraj charged for tax services and contradicted his prior statements that Mashal sent him large payments for appliance purchases, Mashal told investigators that she never purchased appliances from Alaaraj, and Mashal last hired Alaaraj for tax services prior to 2023 with her husband, who was not the individual listed on the tax preparation service invoice.  (Doc. Nos. 31-10 at 11; 37-7 at 10.)

From May 10, 2022 to November 11, 2023, the Atheer Investments Square account was linked to a Bank of America account in the name of Alaraaj's wife.  (Doc. Nos. 31-10 at 12; 37-7 at 11.)  On November 11, 2023, the Atheer Investments Square account was linked to a U.S. Bank account that was opened by defendant Nassar and Mashal on October 13, 2023, and six transfers were made from Atheer Investment Square account to the U.S. Bank account.  (Doc. Nos. 31-10 at 9, 12; 37-7 at 8, 11.)

In December 2024, Alaaraj responded to a grand jury subpoena for records pertaining to the Square payments to both of his accounts referenced in the search warrant affidavit.  (Doc. Nos. 31-10 at 13; 37-7 at 12.)  In response to the subpoena, Alaaraj provided seven payment reports from Square that merely reflected dollar amounts along with a signed statement that he provided Ahmad and Mohdjamal with tax preparation services for nine years, with an average service charge of $750.00 per year.  (Doc. Nos. 31-10 at 13; 37-7 at 12.)[29]

---

[28]  The address on the invoice listing Mohamad Fawakhiri as the recipient of the tax services matches the address of a business that Mohdjamal and Ahmad jointly owned.  (Doc. Nos. 31-10 at 10; 37-7 at 9.)

[29]  The supporting affidavit also described defendant's prior conviction and the then ongoing investigation into defendant's purported bank account takeovers throughout 2023.  (Doc. Nos. 31-10 at 5; 37-7 at 4.)  It also described the SPD report and investigation by bank investigators, the seizure of defendant's Mercedes, the evidence obtained during the inventory search of that vehicle including the interviews with individuals whose names appeared on the cards and mail found in the vehicle, and the search of the Target Residence as well as the evidence obtained pursuant to that search.  (Doc. Nos. 31-10 at 6; 37-7 at 5.)

As to this warrant affidavit, once all reference to the unlawful vehicle stop is excised, probable cause remains to support the issuance of this warrant.  The FBI and BGC engaged in an extensive investigation into Alaraaj's Square accounts, connecting both to Ahmad and Mohdjamal's compromised bank accounts.  Square had previously questioned Alaraaj because his accounts were receiving large transactions and experiencing spikes in declined transactions.  His explanation for this unusual account activity was suspicious and the documentation he presented to Square to support it was contradicted by his previous statements about the amounts he charged for the services listed on the invoice.  Moreover, the invoice he offered was billed to Mohdjamal and Mashal, who had no relation to one another.  Furthermore, several transactions were made between Alaaraj's Square account and Mohdjamal's savings account during the period in which the latter account was allegedly compromised.  Collectively, this information provided the magistrate judge with ample probable cause to believe that there was a fair probability that a crime had occurred and a search of Alaraaj's business would reveal evidence of that crime.

As noted above, as to the second step of the independent source inquiry defendant Nassar argues in conclusory fashion that all of the evidence obtained pursuant to this warrant and the others must be suppressed because the entire investigation began with the unlawful vehicle stop. (Doc. No. 30 at 6, 12–13.)  However, Agent Walker testified that although the initial contact between the CI and Agent Norgaard involved a discussion about defendant's November 17, 2023 arrest, the FBI and BGC investigation began in February 2024 after subsequent meetings with the same CI who provided other information including notifying agents of the SPD report involving the bank account takeover scheme.  On December 27, 2023, Agent Norgaard contacted SPD inquiring about the SPD report.  Rakan also testified that the FBI did not initially contact him until January or February 2024.

As recognized above, in asserting an exception to the exclusionary rule, it is the government's burden to prove by a preponderance of the evidence that the asserted exception applies.  *Baker*, 58 F.4th at 1122; *Saelee*, 51 F.4th at 335; *Ngumezi*, 980 F.3d at 1291; *see also United States v. Maffei*, No. 18-cv-00174-YGR, 2021 WL 4243388, at *2 (N.D. Cal. Sept. 17,

/////

1    2021).[30]  Here, the government has satisfied their burden of showing that the decision to obtain

2    this warrant was not solely based on the November 17, 2023 vehicle stop.  Accordingly,

3    defendant's motion to suppress the bookkeeping business of defendant Alaaraj will be denied in

4    its entirety.[31]

5              2.    Attenuation Doctrine

6          In the alternative to their claim of independent source, the government contends that the

7    four cellphones seized during the November 17, 2023 vehicle stop and subsequently searched by

8    the FBI and BGC, as well as the evidence seized from defendant's person during his January

9    2024 probation violation arrest should not be excluded because any taint from the initial stop is

10   sufficiently attenuated.  (Doc. No. 32 at 14–16 n.12.)

11         Under the attenuation doctrine, evidence is admissible where "the connection between the

12   illegality and the challenged evidence" has become so attenuated "as to dissipate the taint caused

13   by the illegality."  *Gorman*, 859 F.3d at 718 (citing *United States v. Ramirez-Sandoval*, 872 F.2d

14   1392, 1396 (9th Cir. 1989)).  The Ninth Circuit has held that:

15           Finally, under the "attenuation doctrine," evidence is admissible
             when "the connection between the illegality and the challenged
16           evidence" has become so attenuated "as to dissipate the taint caused
             by the illegality."  In evaluating whether the connection between an
17           antecedent Fourth Amendment violation and subsequently
             discovered evidence is sufficiently attenuated to "purge" the "taint,"
18           we consider "the temporal proximity" of the illegal conduct and the
             evidence in question, "the presence of intervening circumstances,"
19           and "the purpose and flagrancy of the official misconduct."

20   *Id.* (internal citations omitted).

21   /////

22   /////

23

---

24   [30] Of course, "[i]t is a defendant's initial burden to show specific evidence demonstrating an
     unconstitutional taint" only then does the burden shift "to the government to show that it acquired
25   its evidence from an independent source."  *United States v. Lancaster*, No. 3:24-cr-00010-ART-
     CLB, 2025 WL 3171392, at *5 (D. Nev. Nov. 13, 2025).
26

27   [31]  The evidence seized pursuant to this warrant which defendant Nassar sought to suppress
     included "a blue thumb drive and other digital and physical evidence, subject to a Filter Memo."
28   (Doc. No. 30 at 13.)

1              a.      *The Four Cell Phones Seized During the November 2023 Arrest*

2              The government argues that the attenuation doctrine applies to the four cell phones that

3      were retrieved during the unlawful stop on November 17, 2023.  (Doc. No. 32 at 14.)  While the

4      government did not address all of the attenuation factors in its initial briefing or at the hearing on

5      the pending motion, it has subsequently argued that the attenuation doctrine applies to this

6      evidence because the FBI and BGC obtained a warrant to search the four cell phones four months

7      after the unlawful stop, they are independent agencies, and during that four-month gap, those

8      agencies conducted their own investigations into defendant's alleged criminal conduct.  (*Id.* at

9      14–15.)  In reply, defendant argues that all three of the relevant factors weigh in favor of

10     suppression of this evidence since:  (1) the four-month gap is insignificant because "the

11     connection is direct and unbroken" between the unlawful stop and subsequent FBI searches; (2)

12     there are "no meaningful intervening acts of free will that could purge the taint of the initial

13     illegality"; and (3) "federal agents deliberately sought warrants to search the phones and other

14     evidence seized during the unlawful stop, demonstrating purposeful exploitation rather than

15     attenuation."  (Doc. No. 33 at 7–8.)

16             As to the first factor, four months passed between the unlawful stop and the application

17     for the federal warrant.  Ordinarily, the temporal proximity factor weighs in favor of suppression

18     "unless 'substantial time' elapses between an unlawful act and when the evidence is obtained."

19     *Strieff*, 579 U.S. at 239 (citation omitted).  The line between violative and non-violative

20     circumstances has historically been deemed two hours between the constitutional violation and

21     subsequently obtained evidence.  *United States v. Zamora*, 23-cr-00020-BLG-SPW, 2023 WL

22     5097098, at *4 (D. Mont. Aug. 9, 2023) ("Typically, a period of less than several hours is

23     insufficient to purge the taint of an illegal search."); *United States v. Williams*, No. 3:23-cr-

24     00086-SLG-KFR-2, 2024 WL 5395146, at *11 (D. Alaska Oct. 15, 2024) (finding that the

25     temporal proximity factor weighed against suppression where four days passed between the

26     unlawful stop and the subsequent investigation), *report and recommendation adopted*, No. 23-cr-

27     00086, 2025 WL 304499 (D. Alaska Jan. 27, 2025).  Thus, consideration this factor appears to

28     weigh against suppression.  However, "to draw any conclusions from [the] timing, the Court must

consider the temporal proximity factor in conjunction with the presence of intervening

circumstances." *United States v. Carpenter*, No. 20-cr-00376-2, 2023 WL 358794, at *8 (N.D.

Ill. Jan. 23, 2023) (alteration in original) (internal quotation marks and citation omitted); *see also*

*United States v. Shetler*, 665 F.3d 1150, 1159 (9th Cir. 2011) (recognizing the same principle in

the context of unlawful searches and subsequent confessions); *United States v. Bocharnikov*, 966

F.3d 1000, 1004 (9th Cir. 2020) (same).

As to the second factor, intervening circumstances capable of purging the taint of a Fourth

Amendment violation include the existence of a valid warrant or witness testimony not coerced

by government officials. *See Rosales*, 2025 WL 1248818, at *2 (citation omitted). Here, the

government appears to argue that there are intervening circumstances sufficient to purge the taint

as to the cell phones seized on November 17, 2023, because the SPD report was independent of

the unlawful stop and the FBI and BGC "had already gotten well into their own investigation"

including reviewing other records and evidence such as phone records showing that defendant

had used the victims' phone number to gain access to their accounts. (Doc. No. 32 at 15.) This

argument is unpersuasive. First, at the evidentiary hearing, Agent Walker testified that the FBI

and BGC began investigating defendant's conduct after a CI tipped them off about defendant

Nassar's November 17, 2023 arrest, even though he was unable to recall any other details of that

meeting. Agent Walker also testified that Agent Norgaard obtained a copy of the EGPD report on

or about December 12, 2023, but did not obtain a copy of the SPD report regarding the bank

account takeover complaint until February 2024. Thus, the timing suggests that while perhaps

not the only information that prompted the FBI's investigation of defendant, the unlawful vehicle

stop certainly played a key role in it. Any purported independence of the SPD report is not

sufficiently strong to constitute an intervening circumstance. *See Williams*, 2024 WL 5395146, at

*11 (emphasis added) (finding that a federal agency's investigation was not triggered by a prior

unlawful stop because federal investigators only learned of that stop *after* they commenced their

investigation). Therefore, consideration of this factor weighs against the application of the

attenuation doctrine as to the cell phones seized on November 17, 2023.

/////

As to the third factor, courts consider whether the constitutional violation reflected more than mere negligence and whether the government actor knew that their conduct was likely unconstitutional but engaged in it anyway. *United States v. Galliher*, No. 18-cr-00011-H-BMM, 2020 WL 4530434, at *5 (D. Mont. Aug. 6, 2020), *aff'd*, No. 20-30228, 2021 WL 5447023 (9th Cir. Nov. 22, 2021). Here, the government once again advances no argument addressing this factor. (Doc. No. 32 at 14–15.) However, even if the conduct at issue did not rise to the level of purposeful or flagrant, that "is of no moment because there was no intervening event to break the connection to the initial arrest" and the cell phones seized at that time. *See Bocharnikov*, 966 F.3d at 1005–06 (finding that although the temporal proximity between the unlawful conduct, the subsequent confession and the evidence in question did not support a finding of flagrant government conduct, the lack of intervening circumstances weighed against application of the attenuation doctrine); *United States v. Griffin*, 884 F. Supp. 2d 767, 782 (E.D. Wis. 2012) (internal quotation marks and citation omitted). Therefore, consideration of this factor does not weigh in favor of application of the attenuation doctrine as to the cell phones seized on November 17, 2023.

A review of the three relevant factors leads the court to conclude that the attenuation doctrine does not apply in this case. Accordingly, the attenuation exception to the exclusionary rule does not apply to the search of the four cell phones seized from defendant Nassar on November 17, 2023.[32]

        b.    *The January 20, 2024 Probation Violation Arrest*

The court need not address this argument under the attenuation doctrine because it has already thoroughly considered it above. There, the court has concluded that the supervised release violation arrest warrant was an intervening event rendering that arrest and seizure of evidence derived from an independent source free of the taint of the earlier unlawful vehicle stop.

---

[32] While there were multiple cell phones retrieved during the EGPD stop, the four cell phones specifically at issue here are: (1) a Red iPhone previously labeled EGPD evidence item # 23-007463-1; (2) a black iPhone in a clear case previously labeled EGPD evidence item # 23-007463-7; (3) a Purple iPhone with no case previously labeled EGPD evidence item # 23-007463-28); and (4) a Blue iPhone previously labeled EGPD evidence item # 23-007463-35. (Doc. Nos. 31-4; 32 at 8.)

1

**CONCLUSION**

2        For the reasons explained above,

3     1.        Defendant's motion to suppress (Doc. No. 30) is GRANTED in part and DENIED

4        in part as follows:

5           a.        Defendant Nassar's motion to suppress evidence is granted as to all

6                 evidence obtained during the November 17, 2025, unlawful vehicle stop;

7           b.        Defendant Nassar's motion to suppress evidence is denied as to all

8                 evidence obtained pursuant to the following federal search and seizure

9                 warrants: (1) 2:24-sw-00329-CKD; (2) 2:25-sw-00052-CKD; (3) 2:25-

10                 sw-0100-SCR; (4) 2:25-sw-00197-CKD; (5) 2:25-sw-00310-AC; (6) 2:25-

11                 sw-0362-JDP; and (7) 2:25-sw-00506-JDP.

12        IT IS SO ORDERED.

13 Dated:    **December 8, 2025**               _Dale A. Drozd_

14                               DALE A. DROZD

15                               UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28